IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| REGEINA F. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action No. |
| v. | ) | 10-3442-CV-S-REL-SSA |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Regeina Young seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's learning disability does not meet or equal Listing 12.05, and (2) discounting the opinion of Dr. Smith. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On March 17, 2009, plaintiff applied for disability benefits alleging that she had been disabled since April 3, 2009. Plaintiff's disability stems from back pain, a learning disability, depression, and acid reflux. Plaintiff's application was denied initially on June 3, 2009, and on July 14, 2009, upon reconsideration. On April 6, 2010, a hearing was held before an Administrative Law Judge. On June 28, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. The Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, her husband, and vocational expert Patty Kent, in addition to documentary evidence admitted at the hearing.

## A.    EARNINGS RECORD

Plaintiff earned the following income from 1980 through 2009, shown indexed:

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1980 | $   474.30 | $ 1,531.50 |
| 1981 | 601.33 | 1,764.09 |
| 1982 | 3,171.16 | 8,817.65 |
| 1983 | 2,690.75 | 7,134.28 |
| 1984 | 4,606.36 | 11,535.26 |
| 1985 | 10,150.00 | 24,378.98 |
| 1986 | 8,487.08 | 19,797.26 |
| 1987 | 1,118.32 | 2,452.24 |
| 1988 | 3,036.74 | 6,346.37 |
| 1989 | 2,898.98 | 5,827.73 |
| 1990 | 2,283.24 | 4,387.27 |
| 1991 | 8,165.00 | 15,125.47 |
| 1992 | 3,771.26 | 6,643.85 |
| 1993 | 3,479.50 | 6,077.59 |
| 1994 | 5,417.47 | 9,215.28 |
| 1995 | 6,896.24 | 11,278.63 |
| 1996 | 1,883.48 | 2,936.76 |
| 1997 | 9,008.07 | 13,271.18 |
| 1998 | 9,375.78 | 13,125.92 |
| 1999 | 2,474.63 | 3,281.56 |
| 2000 | 9,747.57 | 12,248.72 |
| 2001 | 14,119.56 | 17,329.11 |
| 2002 | 13,381.50 | 16,260.21 |

4

| | | |
|---|---|---|
| 2003 | 13,789.58 | 16,356.24 |
| 2004 | 4,578.15 | 5,189.06 |
| 2005 | 0.00 | 0.00 |
| 2006 | 3,629.25 | 3,793.95 |
| 2007 | 8,662.08 | 8,662.08 |
| 2008 | 8,902.54 | 8,902.54 |
| 2009 | 0.00 | 0.00 |

(Tr. at 108-120).

B.      *SUMMARY OF MEDICAL RECORDS*

On August 18, 2005 -- nearly four years before her alleged onset date -- plaintiff saw Paul Wilbur, M.D. (Tr. at 288-291). Plaintiff said she hurt her back a week earlier and was still in pain despite having seen a chiropractor. "Dx [diagnosis] from [illegible] is osteoarthritis, degenerative disc disease, and mild scoliosis." Plaintiff had difficulty sitting and arising from a chair and had decreased range of motion in all directions in her back. Dr. Wilbur assessed back strain, told her to take Motrin four times a day, and prescribed Flexeril (muscle relaxer) and Ultram (non-narcotic pain reliever) as needed. This is the only medical record in the entire file with the exception of consultative exams in connection with plaintiff's application for disability benefits.

Plaintiff's alleged onset date is April 3, 2009.

On May 22, 2009, plaintiff was evaluated by Robert L. Hudson, Ph.D., in connection with her disability application (Tr. at 239-242). Portions of Dr. Hudson's report are as follows:

MENTAL ALLEGATIONS: . . . CL[aimant] is not seeing a MHP [mental health provider] and never has. CL is not taking any prescribed medication. . . . [S]he has a job for 18 hours per week driving a van that picks up and delivers children to a child evaluation school center. CL says she has no PCP [primary care physician]. There is situational depression. . . . She was always in special ed classes in school. Her reading, writing and math skills have always been limited. She did complete 12th grade. CL was divorced when her two children were young and the father was given custody. She has had very little contact with one of the children. This whole situation has always caused her problems on Mother's Day and on the birthday's [sic] of the children but she has

5

not required Tx [treatment]. CL has been married a second time for 19 years. The marriage is stable. . . . Currently she is driving a van part time. . . . CL has worked in care-taking rather extensively, including both adults and children. . . .

MENTAL STATUS INFORMATION: . . . Good rapport was easily established and maintained. CL was pleasant/cooperative. . . . In general thoughts appeared logical, relevant and goal directed if simple. . . .

TEST RESULTS: . . . These scores yield a Verbal IQ of 72, a Performance IQ of 73 and a Full Scale IQ of 70. CL was generally compliant and understood directions. Persistence was not a problem in the actual numbers above but she does have a tendency to give up somewhat easily if allowed to do so. . . .

EFFECTS OF MENTAL IMPAIRMENTS ON ADAPTIVE FUNCTIONING: While there would appear to be no significant limitations in CL['s] adaptive ability some things need to be mentioned. CL probably doesn't really read/write well enough to manage her job w/o compensating and using other cues to know what to mark rather than straight reading. Inservice training is in such a simple format that she is able to pass the tests without full reading or even understanding. Note that CL was 27 years of age before she sat for her DL [driver's license]. She failed it twice with her doing the reading. She passed when it was read to her. . . . CL does drive independently. She could, e.g., go to a location in Springfield by herself. . . . CL can manage ADL's [activities of daily living]. CL has a satisfactory life with her husband. . . . Therefore would appear to be no significant limitations in CL['s] ability to interact socially. . . . CL does fine orally. Reading and writing are compromised but not absent. . . . [S]he can manage simple addition, subtraction and even multiplication. Most of her work has been manual. She has enough judgement to manage simple situations. . . . there would appear to be no significant limits on persistence in completing tasks. . . . There would appear to be no significant limits on completion of tasks in a timely fashion.

Dr. Shannon Brownfield performed a consultative exam on June 1, 2009 (Tr. at 246-249). Dr. Brownfield found that plaintiff had normal range of motion in her arms and cervical spine but limited range of motion in her lumbar spine -- her range of motion was 80° whereas normal is 90° (Tr. 247). She had negative straight leg raising. She had no muscle spasms, no muscle weakness, no muscle atrophy, no sensory abnormalities, and her gait/coordination was normal. He found that plaintiff could hold a pen and write, stand and walk without assistive devices, walk on heel and toes, squat and arise from a squatting position, and had normal grip. Her mental status was normal. He was asked for results of "lab studies, x-ray, etc." and he wrote, "L-spine mild scoliosis; mild OA [osteoarthritis]/DDD [degenerative disc disease].

6

Despite this essentially normal exam, Dr. Brownfield concluded that plaintiff had moderate limitations with "prolonged position", moderate to severe limitations in stooping, handling, and lifting; and globally moderate limitations.

On April 9, 2010, Vann Smith, Ph.D., performed a neuropsychological evaluation of plaintiff in connection with her disability application (Tr. at 294-297).

> CLINICAL HISTORY: . . . She presents with a longstanding history of worsening neurocognitive/emotive symptoms including: 1) impaired recall memory, 2) word finding impairment, 3) affective lability, 4) episodic bradyphrenia [slowed thinking process], 5) sleep pattern disturbance, and 6) executive dysfunction.[1] . . . She describes her overall health status as "fair to poor", noting a positive history of . . . chronic, multifocal, frequently immobilizing poorly controlled, pain which she ranks at a "9" on a 0:10 scale of experienced discomfort. Her history is negative for psychiatric attention aside from a Social Security Disability evaluation in the recent past. . . .

Plaintiff's WAIS-R results showed a Verbal IQ of 76, a Performance IQ of 77, and a Full Scale IQ of 76.

> IMPRESSIONS/DISCUSSION: This patient's . . . data reveal a pattern of abnormal responses and pathgnomonic[2] [sic] indices consistent with the presence of diffuse organic brain dysfunction of moderate severity and static to slowly progressive velocity. The pattern of abnormal findings noted across this patient's neuropsychological test profile is similar to that associated commonly with: 1) Traumatic brain insult and the sequelae[3] thereof, b) [sic] metabolic, hypoxic, toxic or metabolic encephalopathies[4] and 3) the dysregulation of key central neurochemistry and neurophysiology believed now to be precipitated by the brain and spinal cord's compensatory/adaptive response to

---

[1]Executive functioning (EF), or Executive Dysfunction, is defined as "the ability to maintain an appropriate problem solving set for attainment of a future goal. This ability includes the more specific skills of inhibition, planning, and mental representation. Behaviors that can be observed (or reported) in the clinical setting that might indicate an EF deficit include, but are not limited to, poor organization, planning, or strategy use; concrete thinking; lack of inhibition; difficulty grasping cause and effect; inability to delay gratification; difficulty following multi-step directions; difficulty changing strategies or thinking of things in a different way (i.e., perseveration); poor judgment; and inability to apply knowledge to new situations."

[2]"Pathognomonic" means a sign or symptom that is so characteristic of a disease that it makes the diagnosis.

[3]An aftereffect of disease, condition or injury.

[4]Disease, damage or malfunction of the brain.

7

chronically painful disease process (DDD [degenerative disc disease], DJD [degenerative joint disease], Fibromyalgia, SLE,[5] Myalgic Encephalomyelitis,[6] Syringomyelia,[7] etc.). Resulting neurocognitive symptoms (impaired memory, impaired attention, impaired concentration, executive dysfunction [see footnote 1], etc.) interfere with the patient's capacity to carry out routine activities in a consistent manner. This renders the patient in my clinical opinion, disabled at this time.

DIAGNOSIS: In overview, this patient clinical history, mental status examination and neuropsychological screening test profile data reveal a pattern of abnormal findings consistent with the diagnosis(es) of:

I.  Cognitive Disorder, Non-psychotic, Secondary to General Medical Condition(s).

II.  Borderline Intellectual Function
   1)  TBI [traumatic brain injury] with Grade III concussion, *per patient history*
   2)  Thyroid D/O *per patient history*
   3)  GERD [gastro-esophageal reflux disease], *per patient history*
   4)  DDD [degenerative disc disease], *per patient history*
   5)  Chronic, non-psychogenic, poorly controlled pain disorder

(Tr. at 294-297) (emphasis added).

On April 13, 2010, Dr. Smith (the psychologist who rendered the above opinion) completed a Mental Residual Functional Capacity Questionnaire (Tr. at 298-302). Oddly, Dr. Smith found at Axis I (mental illnesses) that plaintiff suffers from "294.9". He did not include the name of this assessment; however, according to the DSM-IV (Diagnostic Statistical Manual), 294.9 means either dementia due to HIV disease or cognitive disorders not otherwise specified. Since there is no mention of HIV in this record, I will assume he meant the latter, although it would have been helpful had he made that assessment clear.

---

[5]Systemic Lupus Erythematosus, or Lupus, is a disease of the immune system.

[6]Myalgic Encephalomyelitis which in 1988 was renamed by the Centers for Disease Control "Chronic Fatigue Syndrome," is a multi-system disease adversely affecting the cellular mitochondria and the heart, brain, neuroendocrine, immune, and circulatory systems.

[7]Syringomyelia is damage to the spinal cord due to the formation of a fluid-filled area within the cord.

8

Under Axis II (personality disorders) he found that plaintiff suffers from "V62.89" again with no explanation. According to the DSM-IV, V62.89 means either "phase of life problem" or "borderline intellectual functioning" -- again I will assume he meant the latter.

He found that plaintiff's current GAF was 30-35.[8]

The sections of the form asking for "treatment and response," "list of prescribed medications," and "side effects" were answered with "N/A" since plaintiff has never been treated. Dr. Smith noted her prognosis as "fair." The symptoms he checked include the following:

- Decreased energy
- Difficulty thinking or concentrating
- Easy distractibility
- Memory impairment - short, intermediate or long term
- Sleep disturbance
- Psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities

Dr. Smith did not find that plaintiff had *any* mental ability that was unlimited. The only mental abilities he found that were limited but satisfactory were the ability to maintain socially appropriate behavior and the ability to adhere to basic standards of neatness and cleanliness.

He found that plaintiff was seriously limited in the following abilities:

- Understand and remember very short and simple instructions
- Carry out very short and simple instructions
- Work in coordination with or proximity to others without being unduly distracted
- Make simple work-related decisions
- Ask simple questions or request assistance

_____

[8]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). A GAF of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

9

- ► Accept instructions and respond appropriately to criticism from supervisors
- ► Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes
- ► Respond appropriately to changes in a routine work setting
- ► Deal with normal work stress
- ► Be aware of normal hazards and take appropriate precautions
- ► Interact appropriately with the general public
- ► Travel in unfamiliar places
- ► Use public transportation

He found that plaintiff was unable to meet competitive standards in the following:

- ► Remember work-like procedures
- ► Maintain attention for two hour segment
- ► Maintain regular attendance and be punctual within customary, usually strict tolerances
- ► Sustain an ordinary routine without special supervision
- ► Complete a normal workday and workweek without interruptions from psychologically based symptoms
- ► Perform at a consistent pace without an unreasonable number and length of rest periods.
- ► Understand and remember detailed instructions
- ► Carry out detailed instructions
- ► Set realistic goals or make plans independently of others
- ► Deal with stress of semiskilled and skilled work

Dr. Smith indicated that plaintiff had chronic, poorly controlled pain which was a significant contributing factor. He did not note, however, that plaintiff does not take so much as over-the-counter pain medication and as a result does not provide an opinion as to how her mental condition would be the same or different from the above assessment were plaintiff to seek treatment for her pain. He found that plaintiff would be likely to miss four days of work per month from her "impairments or treatment" which must mean impairments since plaintiff was receiving no treatment.

C.    *SUMMARY OF TESTIMONY*

During the April 6, 2010, hearing, plaintiff and her husband testified; and Patty Kent, a vocational expert, testified at the request of the ALJ.

10

1.  **Plaintiff's testimony.**

At the time of the hearing plaintiff was 48 years of age and is currently 49 (Tr. at 24).
At the time of the hearing, plaintiff was working at Pediatric Day Clinic as a rider (Tr. at 28-
29). She picks up children who need speech and physical therapy (Tr. at 29). She is required
to get in and out of the vehicle a lot and bend over in the van to fasten their seat belts (Tr. at
29). She works about 24 hours a week earning $7.40 per hour (Tr. at 29). She works from
5:00 a.m. to 8:30 a.m. and then again from 2:00 p.m. to 5:00 p.m. (Tr. at 34). On the break
between her two shifts, she lies on the couch (Tr. at 36).

Plaintiff is unable to work because she cannot stand for very long due to back and leg
pain (Tr. at 30). Sitting hurts as well (Tr. at 30). Lying down helps with her pain (Tr. at 30).
Plaintiff's pain began in 2004 - she woke up, got out of bed, and her back went out (Tr. at 30).
It has never gotten any better (Tr. at 30). Plaintiff's doctor recommended a pain pill and
another pill which, when she tried to get them over the counter, people said it would interfere
with her work so she did not take them (Tr. at 31).

Plaintiff originally hurt her back at work in her early 30s (tr. at 31). She worked for a
book store company and had to sit down and sort things (Tr. at 31). She "just turned around"
and her back went out (Tr. at 31). She filed a worker's compensation claim (Tr. at 31). Now
she has pain "most of the time" (Tr. at 32). Plaintiff was asked why she held onto the wall and
onto furniture as she walked into the hearing room -- she testified that it was because she was
in pain (Tr. at 32). Plaintiff sleeps on her couch because her bed is not as comfortable (Tr. at
33). She sleeps an average of four to five hours each night total (Tr. at 34).

Plaintiff has a lot of memory loss with her kids because they got taken away from her
(Tr. at 35). She testified that losing her kids caused mental problems and depression and she
cannot remember very well (Tr. at 35).

11

Plaintiff cannot do much yard work (Tr. at 36). She cannot walk very far before needing to sit down and rest (Tr. at 36). She cannot sit longer than an hour (Tr. at 37). Plaintiff has "bad days" with worse pain about three days a week (Tr. at 38). Sometimes she goes to Wal-Mart just to get out of the house and walk around, but then her legs will "just go out from under [her] because of [her] back." (Tr. at 38). When she is in Wal-Mart she walks (Tr. at 38). Plaintiff's pain -- from her back down to her ankle -- is so bad she can barely stand it (Tr. at 42). Although plaintiff described her pain the day of the hearing as severe, she was not taking any medication, not even over-the-counter pain relievers (Tr. at 42). Plaintiff had never tried any type of medication for her pain except one pain medicine which disturbed her sleep (Tr. at 42).

Plaintiff cannot lift anything because of her back and because of acid reflux (Tr. at 39). Lifting anything aggravates her acid reflux (Tr. at 39).

Plaintiff thinks her husband is calling her and she hears voices from time to time; she has dreams about her former husband, most of which are nightmares, about once every two weeks (Tr. at 40). She is depressed when she wakes up and wants to go back to sleep forever (Tr. at 40).

Plaintiff's husband works as a metal grinder (Tr. at 39).

2. **Testimony of James Young**

Mr. Young is plaintiff's husband (Tr. at 43). Plaintiff cannot work full time because she cannot even clean the house (Tr. at 43). Most of the time, the house does not get completely cleaned[9] (Tr. at 43). When plaintiff comes home from her final shift of working for the day, she is generally "hurting some" (Tr. at 44).

---

[9]Mr. Young was about to explain why but plaintiff's attorney cut him off (Tr. at 43).

Case 6:10-cv-03442-REL   Document 15   Filed 12/27/11   Page 12 of 23

3.     **Vocational expert testimony.**

Vocational expert Patty Kent testified at the request of the Administrative Law Judge. Ms. Kent testified that a person who would consistently miss one or two days a month or who would be unproductive at least 30 minutes to an hour every day could not work (Tr. at 46-47).

In interrogatories, the vocational expert answered the following hypothetical question:

She can do work where interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by rote with few variables and little judgment required. Supervision required is simple, direct and concrete. She can occasionally lift/carry 10 pounds and frequently less. She can sit for 6 hours and can stand/walk for 2 hours. She must avoid hazards. She can occasionally climb, balance, crawl, kneel, stoop and crouch (Tr. at 234). The vocational expert answered that such a person could be a production worker with 649 in Arkansas and 24,231 in the United States, or she could be a hand packer[10] (Tr. at 235).

V.     *FINDINGS OF THE ALJ*

Administrative Law Judge Edward Starr entered his opinion on June 28, 2010. The ALJ found that plaintiff meets the insured status requirements through September 30, 2012 (Tr. at 11).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 11). Although plaintiff worked after her alleged onset date, "this work activity did not rise to the level of substantial gainful activity . . . [but] it does indicate that she is active enough to do sedentary unskilled work." (Tr. at 11).

Step two. Plaintiff's severe impairments consist of borderline intellectual functioning and disorder of the bank (Tr. at 11).

---

[10]The vocational expert did not provide the information regarding the number of those jobs in the national or regional economy.

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11). The ALJ considered listing 12.05 but found that the requirements were not met (Tr. at 11-12).

Step four.  Plaintiff retains the residual functional capacity to lift and carry ten pounds occasionally and less than ten pounds frequently; can sit for six hours per day; can stand or walk for two hours per day; she must avoid hazards; she can occasionally climb, balance, crawl, kneel, stoop, and crouch; she can work with incidental interpersonal contact, complexity of tasks is learned and performed by rote with few variables and little judgment required; and with simple, direct, and concrete supervision (Tr. at 13).  The ALJ found that plaintiff's subjective allegations of the intensity, persistence and limiting effects of her symptoms were not credible (Tr. at 14).  There was no evidence of any current medical treatment for her symptoms, she was not taking any prescription or over-the-counter medication, her back condition was effectively treated with conservative measures; and there is no evidence of progressively worsening symptoms (Tr. at 14-15).  Plaintiff is unable to perform any of her past relevant work (Tr. at 16).

Step five.  Plaintiff can perform other work available in significant numbers in the economy such as production work or hand packer (Tr. at 16-17).  Therefore, plaintiff is not disabled (Tr. at 17).

## VI.  MENTAL IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that her mental impairment does not meet or equal Listing 12/05(c) or (d) for mental retardation.  The ALJ considered this argument and found as follows:

> The claimant's mental impairment has been considered under the requirements of listing 12.05.  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

14

The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.

The requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e. g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.  In this case, these requirements are not met because the claimant is able to perform activities of daily living independently.

Turning to the requirements in paragraph B, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.

In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Finally, the requirements in paragraph D are met if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction.  Dr. Hudson stated that the claimant was able to manage activities of daily living.  He noted that she . . . could not read well enough to follow recipes but was able to cook and prepare meals.  He stated that she did not take part in the family finances but could pay bills and shop.

In social functioning, the claimant has moderate difficulties.  Dr. Hudson found the claimant limited in the ability to communicate in an intelligible and effective manner; he stated that she did fine orally and that her reading and writing were compromised but not absent.  However, he found there were no significant limitations in her ability to interact socially and that she reported a satisfactory life with her husband.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. Dr. Hudson stated that the claimant had limits in mental/cognitive abilities on basic work-like tasks but noted she had enough judgment to manage simple situations.  He found the claimant exhibited limits in ability to attend and sustain concentration on basic tasks but noted her strengths in Digit Span and Block Design. He found the claimant had no significant limits on persistence in completing tasks or in completion of tasks in a timely fashion.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

15

Accordingly, the requirements in paragraph D are not satisfied.

The limitations identified in the "paragraph B" ("paragraph D" criteria of listing 12.05) criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

* * * * *

With regard to mental impairment, following a mental evaluation on May 22, 2009, Dr. Robert Hudson noted the claimant was limited intellectually but that she tested slightly above mild mental retardation level with a valid, full scale IQ score of 70. He noted that the claimant denied any past or current mental health treatment or prescription medication. Dr. Hudson diagnosed the claimant with adjustment disorder, with depressed mood; borderline intellectual functioning; and current GAF of 58-65, indicative of moderate to mild symptoms in social, occupational, or school functioning but generally functioning pretty well with some meaningful interpersonal relationships. With regard to adaptive functioning, Dr. Hudson stated that the claimant was able to manage activities of daily living. He found there were no significant limitations in the claimant's ability to interact socially. He found the claimant limited in ability to communicate in an intelligible and effective manner but noted that she did fine orally and that her reading and writing were compromised but not absent. He found the claimant had limits in mental/cognitive abilities on basic work-like tasks but that she had enough judgment to manage simple situations. He found the claimant exhibited limits in ability to attend and sustain concentration on basic tasks but noted her strengths in Digit Span and Block Design. He found the claimant had no significant limits on persistence in completing tasks or in completion of tasks in a timely fashion. Following a neuropsychological evaluation on April 9-13, 2010, Vann Smith, Ph.D., diagnosed the claimant with cognitive disorder secondary to general medical conditions and borderline intellectual functioning. He concluded that the claimant's limitations ranged from "seriously limited but not precluded" to "unable to meet competitive standards" with regard to the mental abilities and aptitudes needed to do unskilled work. Based on a review of the entire medical evidence of record, the undersigned concludes that the claimant's mood disorders and any related limitations are not severe to a degree that would limit activities beyond the scope of the residual functional capacity as determined in this decision.

* * * * *

The undersigned finds that the laboratory findings and opinions of Vann Smith, Ph.D., on August 28, 2008, are inconsistent with the objective medical evidence and other evidence of record. While the undersigned acknowledges that consideration must be given to his assessment of the claimant's mental ability to perform work-related tasks,

16

he is not a medical doctor or treating physician and little weight is given to his opinion
due to his short relationship with the claimant.

(Tr. at 11-15).

Listing §12.05C requires :

12.05 <u>Mental Retardation</u>:  Mental retardation refers to significantly subaverage
general intellectual functioning with deficits in adaptive functioning initially
manifested during the developmental period, i.e., the evidence demonstrates or
supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C,
or D are satisfied.

C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
        other mental impairment imposing an additional and significant work-related
        limitation of function[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

In order to meet the requirements of Listing § 12.05C, plaintiff must first meet the

requirements of the above introductory language. <u>Id</u>.  In <u>Maresh v. Barnhart</u>, 438 F.3d 897,

899 (8th Cir. 2006), the court of appeals held that:

[The requirements in the introductory paragraph are mandatory. The overall
introduction to the mental disorders section states: "Listing 12.05 contains an
introductory paragraph with the diagnostic description for mental retardation.  It also
contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the
diagnostic description in the introductory paragraph and any one of the four sets of
criteria, we will find that your impairment meets the listing. . . .  [T]o meet Listing
12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60
through 70; (2) an onset of the impairment before age 22; and (3) a physical or other
mental impairment imposing an additional and significant work-related limitation of
function.

In this case, the evidence of record does not reflect any diagnosis of mental retardation

prior to age 22.  The record contains no IQ score from that time or evidence that plaintiff was

even suspected of being mentally retarded.  Plaintiff failed to show either a sufficiently low IQ

score or deficits in adaptive functioning prior to the age of 22 as required by listing 12.05.

Moreover, as the ALJ stated, the record does not show that Plaintiff had deficits in adaptive

17

behavior initially manifested prior to age 22 (Tr. 14). "Adaptive functioning" refers to how effectively an individual copes with "common life demands" and how well she meets the standards of personal independence expected of one in her particular age group, sociocultural background, and community setting. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 40. The DSM-IV explains that there are 11 adaptive skills areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Id. at 39. A diagnosis of mental retardation requires "significant limitations" in at least two of these areas. Id. The ALJ properly noted Dr. Hudson's findings that Plaintiff had "no significant limitations in . . . adaptive ability".

The record also failed to show subaverage general intellectual functioning prior to the age of 22. Though plaintiff testified she attended special education classes, she was able to complete the 12th grade. Additionally, plaintiff's successful completion of high school and her ability to maintain part-time work indicate that she had greater than "subaverage" intellectual functioning. See Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000)(upholding an ALJ's finding that the claimant's ability to finish the tenth grade, participate in GED classes, and work as an oil changer weighed against his claim of "abnormally low intelligence").

Additionally, none of the medical sources of record indicate a diagnosis of mental retardation at any time. In fact, both Dr. Hudson and Dr. Smith diagnosed plaintiff with borderline intellectual functioning. Mental retardation and borderline intellectual functioning are two separate diagnoses reflecting differing degrees of severity of the same general medical condition. DSM-IV at 45 ("[d]ifferentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information"). In assessing plaintiff's IQ score of 70, Dr. Hudson noted that plaintiff scored at a level that

18

could support a diagnosis of mild mental retardation, but found that she "managed to function at the level of [borderline intellectual functioning] rather than [mild mental retardation]" (Tr. at 14, 241). Plaintiff's full scale IQ score of 76 assessed by Dr. Smith placed plaintiff out of the range of a possible mild mental retardation diagnosis. Dr. Smith also diagnosed plaintiff with borderline intellectual functioning rather than mild mental retardation. As a result, the ALJ properly found that plaintiff had the "severe" impairment of borderline intellectual functioning, and properly declined to find that plaintiff met or equaled Listing § 12.05C.

Similarly, plaintiff did not meet the requirements of Listing § 12.05D. To meet the requirements of Listing § 12.05D, plaintiff must satisfy the requirements of the introductory language discussed above and show that plaintiff had a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

- ▸ marked restrictions in activities of daily living;

- ▸ marked restrictions in social functioning;

- ▸ marked restrictions in concentration, persistence or pace;

- ▸ repeated episodes of decompensation of extended duration.

See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. As discussed above, plaintiff failed to satisfy the requirements of the introductory language of Listing§ 12.05. Additionally, the ALJ properly found that plaintiff exhibited only "mild"restrictions of activities of daily living, "moderate" difficulties in social functioning, and "moderate"difficulties in concentration, persistence, and pace. He also properly recognized that the record showed no episodes of decompensation of extended duration. The ALJ remarked that plaintiff's ability to work part-time and cook meals, along with Dr. Hudson's assessment that plaintiff had no limitations in social functioning and no limitations in persistence or completing tasks, were inconsistent with a finding of "marked" restrictions in any of these areas. Therefore, the ALJ properly concluded that plaintiff did not

meet or equal the requirements of Listing § 12.05D.

Plaintiff brushes over the requirement of an onset before age 22 by stating that "[t]here is nothing in the record indicating that Regeina's intellectual capability is anything other than what it was when she was born and that she has always possessed the general limitations consistent with such sub-average intellectual functioning." However, plaintiff told Dr. Smith that she had traumatic brain injury (Tr. at 297) and that her neurocognitive/emotive symptoms were "worsening" (Tr. at 294). Dr. Smith's impression included "diffuse organic brain dysfunction of moderate severity and static to slowly **progressive** velocity." (Tr. at 296) (emphasis added). The evidence establishes that plaintiff was able to complete high school and she has been able to maintain employment, including one job she held for four years (Tr. at 294). Therefore, plaintiff's statement that there is "nothing in the record" suggesting that her intellectual capability is anything other than what it was when she was born is not accurate, given the evidence from plaintiff's own reports to Dr. Smith and from Dr. Smith's findings.

## VII.    OPINION OF VANN SMITH, PH.D.

Plaintiff argues that the ALJ erred in discounting the opinion of Vann Smith, Ph.D.:

How are his findings "inconsistent with the objective medical evidence"? What evidence? Before the MRI and CatScan, neuropsychologist[s] were used in the operating theater by brain surgeons to help them target parts of the brain that were healthy with those that were not. The ALJ's bias against Dr. Smith[,] giving his "objective findings" lesser weight[,] is not applied to Drs. Hudson and Brownfield, the examining consulting psyuchologist and general practitioner when they could easily be afforded lesser weight for precisely the same reason, i.e., the short relationship with the claimant that did not occur in the course of treatment.

(Plaintiff's brief at p. 17).

The ALJ had this to say about Dr. Smith:

The undersigned finds that the laboratory findings and opinions of Vann Smith, Ph.D., on August 28, 2008, are inconsistent with the objective medical evidence and other evidence of record. While the undersigned acknowledges that consideration must be given to his assessment of the claimant's mental ability to perform work-related tasks,

20

he is not a medical doctor or treating physician and little weight is given to his opinion due to his short relationship with the claimant.

(Tr. at 15).

Plaintiff argues that "Dr. Smith's findings are grounded in an objective battery of tests that indicated cognitive dysfunction". However, a cursory review of Dr. Smith's diagnoses establishes that Dr. Smith relied on plaintiff's reports rather than a "battery of tests." He assessed "Cognitive Disorder, Non-psychotic, Secondary to General Medical Condition(s)." The ALJ properly noted that Dr. Smith is not a medical doctor, he is a psychologist. Therefore, his diagnosis of "cognitive disorder" caused by plaintiff's "general medical condition" is not persuasive considering the fact that plaintiff had never been treated for the "general medical condition," was not on any medication including over-the-counter medication, and had no medical records to support any "general medical condition" which could result in a cognitive disorder. Dr. Smith also assessed borderline intellectual functioning based on traumatic brain injury "per patient history," thyroid disorder "per patient history," gastro-esophageal reflux disease "per patient history," and chronic non-psychogenic poorly-controlled pain disorder. Again, Dr. Smith's assessing a pain disorder as "poorly controlled" when the patient was receiving no treatment and was taking no medication is not a reliable basis for a finding of disability.

Furthermore, Dr. Smith's findings in the Mental Residual Functional Capacity Questionnaire are inconsistent with the other evidence in the record. For example, he finds that plaintiff is "unable to meet competitive standards" in her ability to remember work-like procedures; however, plaintiff was employed at the time. He found that she was unable to meet competitive standards in her ability to maintain attention for a two-hour segment; however, she testified at the administrative hearing that she was able to work two shifts per day for at least three hours each shift. He found that she was "seriously limited" in her ability

21

to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; however, there is absolutely no evidence that plaintiff has any problem working with others.

No opinion from a treating or consulting psychologist that a claimant is "disabled" or cannot be "gainfully employed" is entitled to deference because only the Commissioner may make the ultimate determination regarding disability. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). Therefore, Dr. Smith's opinion that plaintiff is "disabled at this time" is not entitled to any weight.

A one-time evaluation by a non-treating psychologist is not entitled to controlling weight. Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998). Even though Dr. Smith's opinion is not entitled to controlling weight, the ALJ's residual functional capacity assessment is in large part consistent with the findings of Dr. Smith. Dr. Smith found that plaintiff had impaired memory, impaired attention, impaired concentration, and executive dysfunction (see footnote 1). He noted that plaintiff's judgment and insight were "somewhat" restricted, that she was "seriously limited but not precluded"from interacting appropriately with the general public, and that her ability to maintain socially appropriate behavior was "limited but satisfactory." He also found that plaintiff was "unable" to understand, remember, or carry out detailed instructions and was "seriously limited but not precluded" from understanding, remembering, and carrying out simple instructions. Similarly, in plaintiff's residual functional capacity, the ALJ limited plaintiff to incidental interpersonal contact, work requiring little judgment, and work in which the complexity of tasks was learned and performed by rote memory. He also specified that the supervision required must be simple, direct, and concrete. The ALJ included social limitations in plaintiff's residual functional capacity consistent with the limitations assessed by Dr. Smith even though Dr. Hudson found plaintiff had no significant

22

limitations in her ability to interact socially and plaintiff's daily activities suggest no difficult in her ability to interact socially. Therefore, the ALJ appropriately considered Dr. Smith's assessment of plaintiff's ability to perform work related tasks when he assessed her residual functional capacity.

## VIII.   CONCLUSIONS

Plaintiff argued at length that the ALJ was biased against Dr. Smith because the ALJ "categorized Dr. Vann Smith as a plaintiff's doctor when he suggested that he was hired by the undersigned." The ALJ made no such reference that I can find, either in his opinion or during that administrative hearing. Plaintiff fails to cite to any place in the record where the ALJ makes such a suggestion. In any event, the opinion of Dr. Smith was addressed above and I find that plaintiff's argument of bias on the part of the ALJ is wholly without merit.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 27, 2011

23